# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **WILLIAM R. ROCKEL, JR.,** | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No. 7:08-cv-144 (HL) |
| | : |
| **TIM WATKINS, individually, and** | : |
| **in his official capacity as a Deputy** | : |
| **Sheriff, and R. CARLTON POWELL,** | : |
| **in his capacity as Thomas County** | : |
| **Sheriff,** | : |
| | : |
| Defendants. | : |
| | : |
| _____ | : |

# ORDER

Pending before the Court is Defendants Tim Watkins and R. Carlton Powell's

Motion for Summary Judgment (Doc. 30).  For the following reasons, Defendants'

Motion is granted.[1]

## I.    FACTS AND PROCEDURAL HISTORY[2]

---

[1]Defendants' Motion to Exclude the Testimony of Plaintiff's Experts (Doc. 67) is **granted**.  As Rockel failed to properly and timely designate his expert witnesses, the Court did not consider the affidavit submitted by Ralph B. Johnson (Doc. 57) in reaching its decision. The Court also notes that Rockel failed to respond to Defendants' Motion to Exclude.

[2]The Court views the facts in the light most favorable to Rockel as the nonmoving party.

In May of 2007, Plaintiff William R. Rockel was employed by the Thomas County Board of Education. (DSOMF ¶ 1)[3]. During the 2006-2007 school year, Rockel taught a keyboarding class at Thomas County Middle School. (PSOMF ¶ 2)[4]. Rockel taught in five different classrooms: the fifth grade computer lab, the sixth grade computer lab, the seventh grade computer lab, the eighth grade computer lab, and a smaller computer lab located in the fifth grade wing of the school. (DSOMF ¶ 3). For the most part, Rockel conducted his classes in the fifth grade computer lab and seventh grade computer lab. (DSOMF ¶ 4).

Each computer lab contained a number of computers for student use, and also had a teacher work station with a computer. (DSOMF ¶¶ 5-6). The computers all had internet access. (Keown Dep., p. 16). Each teacher and student was assigned a password that allowed him to access the computers. (DSOMF ¶ 7). The mechanism for assigning passwords for teachers and students was universal and anyone knowing a name and social security number could access a computer via that person's password. (PSOMF ¶ 9). Rockel, however, was unaware of any teacher or student at the school who knew his social security number. (Rockel Dep., p. 9).

---

[3]"DSOMF" refers to Defendants' Statement of Undisputed Material Facts (Doc. 32). The cited paragraphs are those admitted by Rockel in his response to the statement of facts.

[4]"PSOMF" refers to Plaintiff's Statement of Undisputed Material Facts (Doc. 59). The cited paragraphs are those admitted by Defendants in their response to the statement of facts.

In April or May, 2007, Rockel used a computer located in either the fifth grade or seventh grade computer lab to open an e-mail regarding male enhancement. (DSOMF ¶ 8).  When he opened the e-mail, the computer was directed to three or four websites that showed gay pornography.  (DSOMF ¶ 9).  The images shown included head shots, pictures of various body parts, and some full nudity pictures.  (Rockel Dep., p. 62).  Rockel did nothing to clear the images or information from the pornographic websites off of the computer.  It was possible that the accessed images were stored on the computer.  (DSOMF ¶ 10).

Rockel opened the male enhancement e-mail on more than one occasion.  He believes he opened the e-mail approximately six times, and the same pornographic websites appeared on the screen each time.  (Rockel Dep., pp. 108-09).  Rockel only accessed the pornographic websites after school hours.  (DSOMF ¶ 13).  He assumes he was logged in under his password when he accessed the websites.  (DSOMF ¶ 14).

Sometime prior to May 7, 2007, but after opening the male enhancement e-mail, Rockel discovered spyware on the teacher's computer in the fifth grade computer lab. (DSOMF ¶ 15).[5]  He did not notify the school's information technology staff about the spyware, but instead took the teacher's computer off the teacher's desk and placed it on the floor beside the desk.  (DSOMF ¶¶ 16-17).  Rockel then took a computer from

---

[5]Spyware is generally used to secretly monitor the activity occurring on the computer on which it has been installed.  Spyware can cause multiple pop-ups on computer screens. (PSOMF ¶ 10).

3

the smaller computer lab on the fifth grade wing and placed it on the teacher's desk. (DSOMF ¶ 18).

Mike Keown, the Thomas County Middle School instructional technology specialist, subsequently asked Rockel if he knew anything about a computer that was missing from the smaller fifth grade computer lab.  (DSOMF ¶ 20).  Keown was the person responsible for the computers at the school.  (DSOMF ¶ 19; Keown Dep., pp. 8-9).  Rockel told Keown that he borrowed a computer from the fifth grade lab because his teacher's computer was infected with spyware.  (DSOMF ¶ 21).  At that time, the infected computer was unplugged and sitting behind Rockel's desk.  (Keown Dep., p. 32).  Keown told Rockel that he would take the teacher's computer and fix it.  (Keown Dep., p. 31).

At approximately 9:00 a.m. on May 7, 2007, Keown took the infected computer to his office.  (PSOMF ¶ 26; Keown Dep., pp. 31, 64).  Keown plugged the computer in and found a number of viruses and some spyware on it.  (Keown Dep., p. 32).  In an effort to determine how the viruses and spyware got on the computer, Keown reviewed the internet history.  (Keown Dep., p. 33).  He discovered that the computer had been used to visit several pornographic websites and found hundreds of pornographic images in the computer's temporary internet files.  (Keown Dep., pp. 33, 64).  Everything Keown found on the computer was under Rockel's password.  (Keown Dep., p. 34).

4

Keown immediately told Debra Knight, the school principal, about what he found on the computer.  (Keown Dep., pp. 35, 64-65).  Keown then showed the information to Knight, school resource officer Spires, and Aaron Stolarik, a school system network administrator.  (Keown Dep., pp. 10, 35, 44).  He later took the computer to the county school board offices, where then-Superintendent Dr. Larry Green and incoming Superintendent Joan Quigg both viewed what was on the computer.  (Keown Dep., pp. 44-45).  Keown was the only person with access to the fifth grade teacher's computer while it was in his possession.  (Keown Dep., p. 44).

On May 7, 2007, Defendant Tim Watkins was employed by the Thomas County Sheriff's Office as Chief Investigator.  (DSOMF ¶ 33).  Defendant R. Carlton Powell was the Thomas County Sheriff.  (DSOMF ¶ 32).  As Chief Investigator, Watkins was responsible for the investigation of allegations regarding the commission of certain crimes, including the crime of sexual exploitation of children.  (DSOMF ¶ 34).  He was also authorized to seek warrants for the arrest of individuals believed to have committed crimes.  (DSOMF ¶ 35).

Watkins was present at the school board offices when the computer was brought in.  (Keown Dep., p. 45).  Watkins received a telephone call from Deputy Steve Jones, another school resource officer, during which Jones asked him to participate in the investigation of pornographic images that were discovered on a computer at Thomas County Middle School.  (Watkins Dep., pp. 28, 45; Watkins Aff., ¶ 4).

5

After finding the images on the fifth grade computer, Keown and Stolarik examined the teacher's computer in the seventh grade computer lab. (Keown Dep., p. 65). Keown discovered pornographic images on that computer as well, along with a history of visits to pornographic websites. (PSOMF ¶ 5). The internet history showed that hours were spent downloading pornographic images or viewing pornographic websites under Rockel's password. (Keown Dep., pp. 50-51).

The two computers at issue were taken by Deputy Jones and delivered to Joe McMurray, an employee in the ID section of the sheriff's office. (PSOMF ¶ 34). McMurray had previously received police training in computer forensics, data recovery and analysis, sex crimes, and forensic evidence. (Doc. 61).

Following the discovery of the pornographic material on the two computers, Rockel met with Knight, Green, and Quigg. (DSOMF ¶ 29). During that meeting, Rockel acknowledged that pornographic images had appeared on his computer. (DSOMF ¶ 30). He was placed on administrative leave with pay. (DSOMF ¶ 31). Rockel was paid his salary until May 21, 2007, at which time he was placed on administrative leave without pay. (Rockel Dep., p. 76).

On May 15, 2007, Watkins met with Keown and Stolarik. (Keown Dep., p. 62; Watkins Aff., ¶ 6). During that meeting, Keown told Watkins about his search for the missing computer and Rockel's statement that the computer was infected with spyware. (Keown Dep., pp. 63-64; Watkins Aff., ¶ 7). Keown also told Watkins that he examined the computer removed from the fifth grade computer lab and found that the

computer had been used to visit several pornographic websites and that hundreds pornographic images were found in its files.  (Keown Dep., pp. 64-66; Watkins Aff., ¶¶ 8, 10; Keown Dep., pp. 64-66).  They also discussed the seventh grade computer.  (Watkins Aff., Ex. 2).  Keown believes he told Watkins that Rockel's password was being used when the pornography was accessed.  (Keown Dep., pp. 67-68).  Stolarik informed Watkins that the computers had only been used after school hours to visit the pornographic websites.  (Watkins Aff., ¶ 11, Ex. 2).

Rockel testified that he could have viewed images of gay pornography on the seventh grade teacher's computer, and would not be surprised if that computer showed that it had accessed gay pornography websites.  It is undisputed that Rockel opened the male enhancement e-mail on the fifth grade computer.  (Rockel Dep., pp. 107, 109-10).  Rockel did not access any pornographic websites other than those that appeared through the e-mail, he did not search for pornographic websites, and no one e-mailed him any pornographic websites.  (Rockel Dep., pp. 109-10).

On June 7, 2007, Watkins received a report prepared by McMurray following McMurray's forensic examination of the two computers.  (PSOMF ¶ 38).  This report contained a number of images that were retrieved from the two computers used by Rockel and examined by McMurray.  (PSOMF ¶ 39).  A majority of these images depicted individuals engaged in sexually explicit conduct.  (Watkins Dep., Exs. 6-8; McMurray Aff., Ex. C).  Some of the individuals appeared to Watkins to be young men or boys.  (Watkins Aff., ¶ 13).  The report showed that Rockel's password was used

when images depicting young men or boys engaged in sexually explicit conduct were downloaded and pornographic websites visited.  (PSOMF ¶ 42).  Watkins saw the images McMurray printed out, but did not personally look at the computers and see on the computer screens any of the images contained on the hard drives.  (Watkins Dep., p. 33).

Watkins did not visit any of the accessed websites in an effort to determine whether the persons portrayed were minors.  Some of the websites included a link to an 18 U.S.C. § 2257 compliance statement, which presumably would provide a viewer with the location of records showing that the participants were all over eighteen years of age, but Watkins did not view any of those statements.[6]  (Watkins Dep., pp. 70-71).  Watkins was not familiar with § 2257 compliance statements.  (PSOMF ¶ 59).  Some of the images and websites retrieved from the computers, however, did not contain any compliance statements.  (McMurray Aff., Ex. C).  Rockel contends that each website or image he looked at contained the disclaimer.  (Rockel Dep., p. 73).  No one

---

[6]18 U.S.C. § 2257, also known as the Child Protection and Obscenity Enforcement Act, requires persons who create materials depicting "actual sexually explicit conduct" to maintain records of their models' ages and identities.  18 U.S.C. § 2257(a).  The Act has certain reporting requirements, and a producer must examine, and retain a copy of, each model's photo identification. 18 U.S.C. § 2257(b).  It must make these records available for inspection for the government upon request, and must also include a statement in its publications noting where the records are kept and who maintains them.  18 U.S.C. §§ 2257(c), (e).  The requirements apply to websites where "actual sexually explicit conduct" is shown. 18 U.S.C. § 2257(e)(1).  There is no question that the materials involved in this case depict "actual sexually explicit conduct," which is defined as "sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex," 18 U.S.C. § 2256(2)(A)(i), as well as bestiality, masturbation, sadistic or masochistic abuse, and the "lascivious exhibition of the genitals or pubic area of any person," 18 U.S.C. § 2256(2)(A)(ii)-(v).

attempted to recover the male enhancement e-mail to verify Rockel's claim that the pornography just appeared when he opened the e-mail.  (PSOMF ¶ 37).

McMurray's report also shows that pornographic images were accessed or downloaded by users other than Rockel on November 2, 2006 and March 20, 2007.  (PSOMF ¶¶ 12-13).  The entries on McMurray's report are not in chronological order.  (PSOMF ¶ 41).  The report shows that a pornographic image was downloaded onto the seventh grade computer under Rockel's password at 10:44 a.m. on May 7, 2007.  (PSOMF ¶ 27; Keown Dep., p. 72).  Keown opined that this was a result of school officials examining the computer and accessing the images saved in the history.  (Keown Dep., pp. 72-73).  Watkins admittedly did not investigate anyone other than Rockel with regard to the pornographic images found on the computers.  (Watkins Dep., pp. 58, 60).  He also did not know what time of day the fifth grade computer was confiscated, though he admitted that having that information would have been advisable, and did not know the chain of custody of the computer between the time it left the school computer lab and when it was presented to him.  (PSOMF ¶¶ 67-69).

On June 11, 2007, Watkins went to Rockel's house to speak with him, but Rockel was in Tallahassee.  Watkins gave Rockel's mother his business card and asked that Rockel call him.  (PSOMF ¶ 43).  Rockel's mother called Rockel and told him that Watkins had come by.  Rockel called Watkins from Tallahassee.  (Rockel Dep., pp. 76-77).  Watkins told Rockel that he would like for Rockel to come and talk to him about the images found on the computers.  (PSOMF ¶ 44).  Watkins expressly told Rockel

that he was not going to arrest him at that time.  (PSOMF ¶ 45).  Rockel told Watkins

that he would speak to his attorney prior to making any statements.  (PSOMF ¶ 46).

Watkins told Rockel that was fine and to contact him when he wanted to come in.

Rockel then called his attorney, H. Burke Sherwood, who instructed Rockel to refrain

from making any statements until he had an opportunity to speak with Watkins.

(PSOMF ¶ 47).  Sherwood spoke to Watkins, who told Sherwood that there were no

plans to arrest Rockel at that time, but he had questions related to the computers.

(PSOMF ¶ 48).  When Sherwood told Watkins that Rockel would not be speaking to

him without counsel, Watkins became agitated and hostile and said that he would do

what he had to do, or words to that effect.  (Sherwood Aff., p. 2).[7]  Sherwood instructed

Rockel not to talk to Watkins.  (Rockel Dep., p. 86).

On June 12, 2007, Watkins met with Dr. Tim Jones, a Thomasville pediatrician.

(PSOMF ¶ 71).  During that meeting, Watkins showed Dr. Jones a number of images

that were retrieved from the computers used by Rockel.  (Watkins Aff., ¶ 16; Jones Aff.,

¶ 6).  At least one of the images shown to Dr. Jones was downloaded by someone

other than Rockel.  (Watkins Dep., p. 72).  Dr. Jones examined the images and

determined, based on his training and knowledge as a pediatrician, that some of the

people appeared to be adults, and some appeared to be of persons under eighteen

years of age.  (PSOMF ¶ 72).  The age determination was based on the formation of

---

[7]Watkins testified that he did not become agitated when speaking with Sherwood, but the Court must view the evidence in the light most favorable to Rockel on summary judgment.

the breastbone of the people in the images. (Watkins Dep., pp. 96-97). Dr. Jones' analysis was the determining factor for the sheriff's office to prosecute. (PSOMF ¶ 74).

After meeting with Dr. Jones, Watkins met with Thomas County Magistrate Judge S. Andrews Seery. (Watkins Dep., p. 76; Watkins Aff., ¶ 17). During this meeting, Watkins submitted affidavits for criminal warrants against Rockel for the offenses of sexual exploitation of children and computer trespass. (DSOMF ¶ 54). Watkins was placed under oath and testified as to the evidence upon which he sought the criminal warrants. (Watkins Aff., ¶ 17). The factors Watkins used in determining he had probable cause to seek the warrants included the images, Dr. Jones' opinion about the age of the participants, the report from McMurray, and information from Keown that the computer was located at Rockel's desk. (Watkins Dep., pp. 104, 114, 123). Judge Seery then signed two criminal warrants against Rockel, one for sexual exploitation of children, and the other for computer trespass. (DSOMF ¶¶ 56-57).

At the end of the business day on June 12, 2007, after the warrants had been issued, Watkins called Rockel and told him he needed to call his attorney and turn himself in. Rockel was then leaving to take his mother to Columbus for surgery. Watkins instructed Rockel to call when he returned to Thomas County and they would set up a time for Rockel to turn himself in. (PSOMF ¶ 53; Rockel Dep., pp. 87-89; Watkins Dep., p. 88).

Rockel returned to Thomas County on June 14, 2007. During his trip, Rockel and his mother learned from media sources the nature of the arrest warrants. (PSOMF

¶ 54).  Upon his return, Rockel called Watkins, who told Rockel he needed to turn himself in by 11:00 A.M. the next day, or he would have to spend the weekend in jail because there would be no way for him to get bonded out.  (Rockel Dep., p. 91).

Rockel turned himself in and was arrested on the warrants on June 15, 2007. (DSOMF ¶ 58).  After Rockel was booked, Watkins told Rockel that he wished Rockel had come and talked to him, and if Rockel could have explained what happened, charges may not have been filed.  (Watkins Dep., p. 118; Rockel Dep., p. 97).  Rockel was released later that day on bond.  (Rockel Dep., p. 99).

On June 29, 2007, Sherwood filed an entry of appearance on behalf of Rockel in connection with the warrants.  (DSOMF ¶ 59).  Sherwood then had a number of conversations with Ray Auman, an assistant district attorney.  (PSOMF ¶ 81). Sherwood and Auman eventually agreed that Rockel would enter into a negotiated plea whereby Rockel would plead guilty to the crime of computer trespass and voluntarily surrender his teaching certificate.  (DSOMF ¶ 61).

On May 14, 2008, Rockel entered a plea of guilty to the computer trespass charge.  (DSOMF ¶ 63).  Following the guilty plea, Rockel signed a voluntary surrender of his teaching certificate.  (DSOMF ¶ 64).  The sexual exploitation charge was subsequently dismissed.  (PSOMF ¶ 86).

Prior to May, 2007, Rockel and Watkins had not had any contact with each other. (DSOMF ¶ 67).  Rockel did not believe Watkins harbored any ill will towards him, but thinks Watkins' actions in saying he was not going to have Rockel arrested but turning

around and arresting him shows ill will on Watkins' part.  (Rockel Dep., pp. 106, 134).

Watkins contends that he did not harbor any ill will against Rockel before, during, or

after his involvement with Rockel in 2007.  (Watkins Aff., ¶¶ 20-21).

Watkins received police training in the areas of crimes against children, the

investigation and prosecution of child abuse, and sex offenders.  (Doc. 60).  He has

never had any specific training with regard to computer crimes, and was not

knowledgeable about spyware.  (PSOMF ¶¶ 51, 55).  He was aware, however, of

Rockel's statement that the computer had spyware on it.  (Watkins Dep., p. 44).

Watkins had investigated child sex crimes prior to May of 2007, and had caused a

warrant to issue on a sexual exploitation of a minor charge relating to computer

pornography prior to Rockel's case.  (Watkins Dep., pp. 23-24).

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue as

to any material facts and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  A genuine issue of material fact arises only when "the evidence

is such that a reasonable jury could return a verdict for the nonmoving party."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986).

When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party.  Id. at 254-55.  The Court may not, however, make credibility determinations or weigh the evidence.  Id. at 255; *see also* Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).  If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law.  Id. at 324-26.  This evidence must consist of more than mere conclusory allegations.  *See* Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

## B. Conclusions of Law

### 1.    Qualified Immunity of Watkins

14

This case is based on an arrest that occurred following the issuance of a criminal warrant.[8]  Because a warrant was issued prior to his arrest, Rockel's claim is analyzed as a malicious prosecution claim.  *See* Wood v. Kesler, 323 F.3d 872, 881 (11th Cir. 2003).  To establish a malicious prosecution claim under 42 U.S.C. § 1983, a plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures and establish the elements of a malicious prosecution tort claim.  Id.  The elements of a malicious prosecution claim are:  (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.  Id.

Watkins contends that he is entitled to summary judgment in his individual capacity on the Fourth Amendment claim because Rockel's claim is barred by the doctrine of qualified immunity.  "Qualified immunity is a doctrine that generally shields '[g]overnment officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established rights of which a reasonable person would have known.'"  Denson v. United States, 574 F.3d 1318, 1338 (11th Cir. 2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).  To invoke qualified immunity, the government official must establish that he was acting within the scope of his discretionary authority.  Case v.

---

[8]Rockel's claims relate only to the sexual exploitation of children charge.

Eslinger, 555 F.3d 1317, 1325 (11th Cir. 2009).  Once that has been established, the burden shifts to the plaintiff to overcome the defense of qualified immunity.  Id.

There is no dispute that Watkins was acting within the scope of his discretionary authority when the events complained of occurred.  Thus, to avoid summary judgment on the basis of qualified immunity, Rockel must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1264 (11th Cir. 2004).

Traditionally, in analyzing a qualified immunity claim, a court was required to first decide whether the facts the plaintiff presented made out a violation of a constitutional right.  Only if the plaintiff satisfied this first step did the court consider whether the right at issue was clearly established at the time of the defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).  In the 2009 case of Pearson v. Callahan, --- U.S. ---, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009), however, the Supreme Court reconsidered this procedure, and decided that it should no longer be regarded as mandatory.  "The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Id. at 818.

To overcome Watkins' qualified immunity, Rockel bears the burden of showing that in May and June, 2007, the state of the law gave Watkins fair warning that his

alleged actions were unconstitutional.  Thomas *ex rel.* Thomas v. Roberts, 323 F.3d 950, 953 (11th Cir. 2003) (citing Hope v. Pelzer, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)).  The notice to the government official must be a "fair and clear warning."  Hope, 536 U.S. at 746.  "The 'clear' requirement stems from the fact that the purpose of qualified immunity is to protect government officials performing discretionary functions from civil liability when their actions violate no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'"  Thomas *ex rel.* Thomas, 323 F.3d at 953 (citations omitted).  Only Supreme Court, Eleventh Circuit, and Georgia Supreme Court cases can "clearly establish" law in this circuit.  Id. at 955.

In his response to Defendants' Motion, Rockel states, "Defendants do not dispute that the right to be free from malicious prosecution was clearly established at the time of the incident.  Thus, Plaintiff need only analyze whether the officers violated Plaintiff's constitutional rights."  (Doc. 54, p. 5).  Rockel then goes on to address the first prong of the qualified immunity test, but does not address the "clearly established" prong apart from the one sentence quoted above.

Rockel has pointed to no pre-existing case law that would have made it apparent to a reasonable person in Watkins' place that what he was doing was a violation of federal law.  Instead, Rockel is improperly attempting to shift the burden to the Defendants.  It is not enough for Rockel to make "general conclusory allegations of some constitutional violation or [] stat[e] broad legal truisms."  Adams v. St. Lucie

County Sheriff's Dep't, 962 F.2d 1563, 1574 (11th Cir. 1992) (Edmonson, J., dissenting), *approved en banc* 998 F.2d 923 (11th Cir. 1993) (citations omitted). Instead, Rockel "must prove the existence of a clear, factually defined, well-recognized right of which a reasonable police officer should have known. . . .The right must be particularized to put potential defendants on notice that their conduct probably is unlawful." Id. at 1574-75 (citations omitted).  Rockel has not presented a United States Supreme Court, Eleventh Circuit, or Georgia Supreme Court case finding a Fourth Amendment violation under circumstances similar to those alleged in the complaint.

Rockel also had the option of pointing to "general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances" and established clearly the unlawfulness of Watkins' conduct. *See* Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007).  He failed to do so.

An officer may also violate a clearly established right when he takes actions that are so egregious that the officer must be aware that he is acting illegally.  Thomas *ex rel.* Thomas, 323 F.3d at 955-56.  The Court does not find Watkins' actions as alleged to be so egregious that the unconstitutionality of them would be readily apparent absent clarifying caselaw.  Id.

Because Rockel has failed meet the clearly established prong of the qualified immunity test, Watkins is entitled to qualified immunity on the Fourth Amendment claims against him in his individual capacity.

18

Even if Rockel had met his burden, Watkins would still be entitled to qualified immunity on the Fourth Amendment claim because he had at least arguable probable cause to arrest Rockel.  *See* <u>Case</u>, 555 F.3d at 1327 ("[A]n officer is still entitled to qualified immunity if arguable probable cause existed.")  Arguable probable cause has been explained as follows:

> Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.  In determining whether arguable probable cause exists, [courts] apply an objective standard, asking whether the officer's actions are objectively reasonable . . . regardless of the officer's underlying intent or motivation.  Arguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest, which would negate the concept of probable cause and transform arresting officers into prosecutors.

<u>Lee v. Ferraro</u>, 284 F.3d 1188, 1195 (11th Cir. 2002) (internal quotation marks and citations omitted).

Here, Watkins applied for an arrest warrant for sexual exploitation of children in violation of O.C.G.A. § 16-12-100.  Section 16-12-100(8) states that "it is unlawful for any person knowingly to possess or control any material which depicts a minor or a portion of a minor's body engaged in any sexually explicit conduct."  When the totality of the circumstances is viewed objectively, the Court finds that a reasonable officer in Watkins' position could have believed that he had probable cause to arrest Rockel, based on the investigations conducted by both the school technology specialists and

the sheriff's office specialist, the images found on the computers used by Rockel, his interview with the school technology staff, and in light of Dr. Jones' statement that some of the individuals depicted in the images appeared to be under the age of eighteen years.  At the very least "officers of reasonable competence could disagree" on whether a warrant should have issued, and the Supreme Court has stated that immunity should be recognized in that situation.  Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Rockel's basic argument is that Watkins conducted an inadequate investigation. An arresting officer is required to conduct a reasonable investigation to establish probable cause.  Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998). But what Rockel is asking the Court to do here is require an investigating officer to "take every conceivable step . . . to eliminate the possibility of convicting an innocent person and ignore the probable cause standard to amass convincing proof of guilt."  Fronczak v. Pinellas County, Fla., 270 Fed. Appx. 855, 858 (11th Cir. Mar. 24, 2008) (unpublished). The evidence confirms that Watkins conducted a reasonable investigation.  Watkins is entitled to qualified immunity from Rockel's Fourth Amendment claims against him in his individual capacity.

### 2.    Fourteenth Amendment Due Process Rights

The Due Process Clause of the Fourteenth Amendment guarantees fair procedures, and prohibits the deprivation of life, liberty, or property by a state without due process of law.  Under the rubric of substantive due process, it "protects individual

liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)).  Rockel contends that Watkins' conduct in arresting and prosecuting him violated his substantive due process rights.

"If an Amendment provides an explicit textual source of constitutional protection against the sort of conduct complained of, that Amendment - - not the more generalized notion of substantive due process under the Fourteenth Amendment - - is the guide for analyzing the claim." Jordan v. Mosley, 298 Fed.Appx. 803, 805 (11th Cir. Aug. 28, 2008) (unpublished); *see also* Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).  Rockel's claim is premised on an alleged unlawful arrest. Under Graham v. Connor and Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994), Rockel's claim should be analyzed under the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment.

Rockel has not disputed in his response to Defendants' Motion that Watkins is entitled to summary judgment on the Fourteenth Amendment claim.  Further, there is no substantive due process right to be free from malicious prosecution.  Albright, 510 U.S. at 275.  Accordingly, Watkins is entitled to summary judgment on the Fourteenth Amendment claim.

### 3.    Official Capacity Claim Against Watkins

Rockel has also sued Watkins in his official capacity.  Like the Fourteenth Amendment claim, Rockel has not disputed in his response to Defendants' Motion that Watkins is entitled to summary judgment on the claim against him in his official capacity.  As Rockel appears to have abandoned his official capacity claims against Watkins, summary judgment in Watkins' favor on those claims is warranted.  In any event, Defendants are correct that a lawsuit against Watkins in his official capacity is simply a suit against the relevant governmental entity, in this case the Sheriff of Thomas County, Georgia.  Kentucky v. Graham, 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Manders v. Lee, 338 F.3d 1304, 1311 (11th Cir. 2003).  The claims against Watkins in his official capacity would be dismissed as redundant regardless.

### 4.    Official Capacity Claim Against Powell

Rockel also sued Powell in his official capacity as Sheriff of Thomas County, Georgia.  Rockel contends that Powell failed to train or supervise Watkins in the proper use of arrest authority and issuance of warrants, and the failure to train was the proximate cause of the violation of Rockel's constitutional rights.

Absent a constitutional violation by Watkins, Powell is entitled to summary judgment.  It is unnecessary to review Rockel's failure to train argument.  *See* Case, 555 F.3d at 1328; Rooney v. Watson, 101 F.3d 1378 (11th Cir. 1996).[9]

---

[9]Defendants also raised the Eleventh Amendment as a defense to the official capacity claims.  The question of whether a sheriff is entitled to Eleventh Amendment immunity requires a complex factual analysis to determine whether the sheriff was acting as an arm of

III.    **CONCLUSION**

For the reasons set forth above, Defendants Watkins and Powell's Motion for

Summary Judgment (Doc. 30) is granted.  There being no further claims remaining, let

judgment be entered accordingly.


**SO ORDERED**, this the 24th day of November, 2009.


                              *s/  Hugh Lawson*
                              **HUGH LAWSON, SENIOR JUDGE**
mbh

---

the state or as an arm of the county in carrying out the challenged function.  *See* <u>Manders</u>,
338 F.3d at 1309.  In light of the Court's ruling on the Fourth Amendment issue, and in the
absence of any in depth briefing by the parties on the issue, the Court will not undertake the
analysis here.